**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KEELY ROBERTS, individually and as parent and next friend of C.R. and L.R., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | Lead Case No. 22-cv-6169 |
| v. | ) ) | Hon. Steven C. Seeger |
| SMITH & WESSON BRANDS, INC., *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |
| ————————————————— | ) ) | |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) ) ) ) ) | Consolidated cases: 22-cv-6186; 22-cv-6361; 22-cv-6193; 22-cv-6191; 22-cv-6171; 22-cv-6181; 22-cv-6183; 22-cv-6190; 22-cv-6185; 22-cv-6178; and 22-cv-6359 |
| ————————————————— | ) | |

## MEMORANDUM OPINION AND ORDER

Shots rang out at a Fourth of July parade in Highland Park, Illinois in 2022. Out of nowhere, in the blink of an eye, a celebration of the birth of freedom turned into a complete nightmare. When it was all said and done, scores of patriotic Americans were killed or injured, leaving wounds that will never fully heal.

Keely and Jason Roberts, and their two minor children C.R. and L.R., attended the parade. The family suffered life-changing injuries. Keely and C.R. were shot, and L.R. was hit by shrapnel.

The Roberts family later filed suit in state court against a collection of defendants, including three Smith & Wesson companies. They also sued two gun dealers involved in the sale of the firearm to the alleged shooter, Robert Crimo III. Plaintiffs brought claims against Crimo III and his father, Robert Crimo, Jr., too.

The Roberts family was not alone, at the parade or in the courthouse. A dozen families filed separate lawsuits against the defendants in state court. Smith & Wesson, in turn, removed all twelve cases to federal court. Smith & Wesson offered four different grounds for pulling this case from state court to federal court.

The Roberts family and the rest of the plaintiffs moved to remand. For the reasons stated below, the motions to remand are hereby granted.

## Background

When deciding a motion to remand, the Court accepts as true the complaint's allegations at the time of removal. *See Curry v. Boeing Co.*, 542 F. Supp. 3d 804, 808 (N.D. Ill. 2021) ("The court assumes the truth of the operative complaint's allegations at the time of removal . . . ."); *Elftmann v. Village of Tinley Park*, 191 F. Supp. 3d 874, 878 (N.D. Ill. 2016) ("In considering a motion for remand, the court must examine the plaintiffs' complaint at the time of the defendant's removal and assume the truth of all factual allegations contained within the original complaint.") (quoting *Scouten v. MNL-FTS, LLC*, 708 F. Supp. 2d 729, 731 (N.D. Ill. 2010)).

The Court also may consider facts stated in the notice of removal. *See Curry*, 542 F. Supp. 3d at 808; 14C Charles Alan Wright *et al.*, Federal Practice and Procedure Jurisdiction § 3739 (4th ed. 2023) ("Whether an action should be remanded to state court must be resolved by the district court with reference to the complaint, the notice of removal, and the state-court record at the time the notice of removal was filed."). But the complaint's "[j]urisdictional

allegations control unless it is legally impossible for them to be true." *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (alteration in original) (quoting *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 815 (7th Cir. 2015)).

This case is about a mass shooting at a Fourth of July parade in the heart of the country. For a few years, the COVID-19 pandemic dampened festivities, and prevented communities from getting together for a full-throated celebration of Independence Day. But in 2022, Highland Park finally returned to normal, or so it seemed. Hundreds of families attended the parade. *See* Cplt., at ¶ 1 (Dckt. No. 1-2).

Crimo III was there, too. He arrived on his bicycle around 8:30 a.m., before the parade started. *Id.* at ¶ 142. He didn't bring flags or banners, or patriotic spirit. He brought a Smith & Wesson Military and Police ("M&P") 15 semi-automatic rifle. *Id.* at ¶¶ 3, 24, 144. And three 30-round magazines. *Id.* at ¶ 141. His gun was loaded, and Crimo III was full of bad intentions.

Crimo III perched himself on the rooftop of a cosmetics store on the parade route, with his lethal weapon in hand. *Id.* at ¶ 143. And from there, when the celebration began, he unloaded his M&P15 rifle on the crowd below. *Id.* at ¶ 144.

The bullets started flying at 10:14 a.m. *Id.* Dozens of projectiles flew through the air and tore through the community. The shooter "fired a total of 83 shots indiscriminately at the hundreds of people gathered to watch and participate in the Highland Park Fourth of July Parade." *Id.* at ¶ 144. The 83 shots were fired in a matter of seconds. *Id.* at ¶ 3.

Seven people died. Dozens were injured. *Id.*

The devastation reached the Roberts family. Keely and Jason Roberts live in Highland Park with their twin boys, C.R. and L.R. *Id.* at ¶ 19. The family arrived early at the parade,

eager to celebrate and hopeful for good seats. *Id.* at ¶ 148. They found prime seats right in front of the pancake house. *Id.*

All of a sudden, they heard popping sounds. *Id.* at ¶ 149. At first, Jason Roberts thought that it was fireworks. And then, bullets hit the family. *Id.*

Two members of the family suffered gunshot wounds. *Id.* at ¶¶ 2, 5. Keely was hit by a bullet that "punctured her forefoot tearing through it and exiting through her heel." *Id.* at ¶ 2. She received treatment at two different hospitals for her injuries. *Id.* at ¶ 19.

Another bullet hit C.R. *Id.* at ¶ 5. C.R. laid on the sidewalk, "lifeless and unable to move." *Id.* at ¶ 4. "His skin was white, his lips were blue. He was unconscious." *Id.* at ¶ 152. He needed hospitalization for 73 days "for comprehensive treatment for the catastrophic injuries he sustained." *Id.* at ¶ 19. His life was saved, but was forever changed. C.R. "will never walk again." *Id.* at ¶ 5.

The other boy, L.R., suffered injuries, too. He was hit with shrapnel and treated at a local hospital. *Id.* at ¶ 19.

"Collectively, the entire Roberts family has suffered, and continues to suffer, severe emotional distress stemming from the attack on their family." *Id.* The family has "trouble participating in public, crowded events due to the fear of another massacre." *Id.* at ¶ 157.

The complaints in each of the consolidated cases tell similar stories of personal destruction. So many suffered so much at that Fourth of July parade, and for so long after.

The police soon arrested Robert Crimo III. *Id.* at ¶ 28. He was charged with 21 counts of first-degree murder, 48 counts of attempted murder, and 48 counts of aggravated battery. *Id.* The criminal case remains pending in state court.

4

Keely and Jason Roberts later filed suit on behalf of themselves and their children in the Circuit Court of Lake County. The complaint includes eleven claims against seven defendants. All of the claims involve state law. There are no federal claims.

The defendants include three Smith & Wesson entities: Smith & Wesson Brands, Inc., Smith & Wesson Co., and Smith & Wesson, Inc. (collectively, "Smith & Wesson"). Smith & Wesson is the manufacturer of the M&P15 semi-automatic rifle. *Id.* at ¶¶ 20–22; *id.* at ¶ 24 ("One or more of the Smith & Wesson defendants manufactured, designed, marketed and sold the Smith & Wesson M&P15 semiautomatic rifle that was used in the shooting.").

The Roberts family also sued two gun dealers: Bud's Gun Shop and Red Dot Arms. *Id.* at ¶¶ 25–27. Bud's Gun Shop has a "large online retail presence," with physical locations in Kentucky and Tennessee. *Id.* at ¶ 25. The complaint alleges that "Bud's Gun Shop sold the Shooter the Smith & Wesson M&P15 semiautomatic rifle that he used in the shooting." *Id.* at ¶ 26. Red Dot Arms is a gun retailer in Lake County. *Id.* at ¶ 27. Red Dot Arms "transferred to the Shooter the Smith & Wesson M&P15 semiautomatic rifle." *Id.*

The Roberts family also named the alleged shooter, Robert Crimo III, and his father, Robert Crimo, Jr. *Id.* at ¶¶ 28–31. The complaint alleges that Crimo III purchased the Smith & Wesson rifle online from Bud's Gun Shop and picked up the gun from Red Dot Arms. *Id.* at ¶ 29.

Crimo III used a Illinois Firearm Owners Identification card – a so-called "FOID card" – to purchase the weapon. *Id.* at ¶ 127. Illinois residents must have a FOID card to legally possess firearms or ammunition. A person can get a FOID card by submitting an application to the Illinois State Police. Crimo III applied for a FOID card in December 2019. *Id.* at ¶ 123.

Crimo Jr. sponsored his son's application for a FOID card, and assumed liability for any ensuing damages. The father attested that he "understands he shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition." *Id.* at ¶ 31 (cleaned up); *see also id.* at ¶¶ 30, 124.

The first four claims are against Smith & Wesson (only). Counts I and II allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). *Id.* at ¶¶ 158–201. Count III is a claim under the Illinois Uniform Deceptive Trade Practices Act. *Id.* at ¶¶ 202–24. Count IV is a negligence claim. *Id.* at ¶¶ 225–45.

The next two claims involve the two gun dealers, Bud's Gun Shop and Red Dot Arms. Count V is a negligence claim, and Count VI is an aiding and abetting claim. *Id.* at ¶¶ 246–84.

The next three claims are against Crimo III and his father, Crimo Jr. Count VII is a negligence claim against the father, Crimo Jr. *Id.* at ¶¶ 285–303. Counts VIII and IX are assault and battery claims against the alleged shooter, Crimo III. *Id.* at ¶¶ 304–18.

The final two claims are against all Defendants. Counts X and XI allege intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶¶ 319–36. Keely Roberts brings those claims on behalf of herself and her family.

Smith & Wesson responded by timely removing the case to federal court, and removed the other cases, too. *See* Notice of Removal (Dckt. No. 1). Smith & Wesson served the notice of removal and attached consents from the two gun dealers. *Id.* at ¶ 9; *see also* Consents to Removal (Dckt. No. 1-1). Crimo III and Crimo Jr. did not join in, or consent to, removal.

Smith & Wesson addressed the lack of consent in the notice of removal. Smith & Wesson argued that the removal statute does not require consent when a case involves a federal officer. *Id.* at ¶ 6. In the alternative, Smith & Wesson asserted that the claims against them arise

under federal law, which means that the Court can simply sever the claims against the non-consenting defendants under 28 U.S.C. § 1441(c)(2). *Id.* at ¶ 9.

This Court later granted a motion to reassign all of the related cases to this Court's docket. *See* 12/15/22 Order (Dckt. No. 30). The complaints are not quite identical, but there is substantial overlap.[1]

Plaintiffs in each case filed motions to remand. This Court consolidated the twelve cases "for the purpose of resolving the motions to remand." *See* 1/4/23 Order (Dckt. No. 39).

The motions to remand are now before the Court.

At this point, the question is not about the merits of the case. The question is whether this case can stay in federal court at all. That is, the question is whether this Court has subject matter jurisdiction. If not, the case must go back to state court.

---

[1] Plaintiffs in five of the eleven other consolidated cases brought the same eleven counts against the same seven Defendants. *See Tenorio v. Smith & Wesson Brands, Inc.*, No. 22-cv-6186 (Dckt. No. 1-2); *Zeifert v. Smith & Wesson Brands, Inc.*, No. 22-cv-6193 (Dckt. No. 1-2); *Bennett v. Smith & Wesson Brands, Inc.*, No. 22-cv-6171 (Dckt. No. 1-2); *Vergara v. Smith & Wesson Brands, Inc.*, No. 22-cv-6190 (Dckt. No. 1-2); *Rodriguez v. Smith & Wesson Brands, Inc.*, No. 22-cv-6185 (Dckt. No. 1-2). Plaintiffs in one of the eleven other consolidated cases brought nine counts against the same seven Defendants. *See Sedano v. Smith & Wesson Brands, Inc.*, No. 22-cv-6183 (Dckt. No. 1-2). That complaint does not bring an assault claim against Crimo III, or a second count based on intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶¶ 295–310. Plaintiffs in two of the eleven other consolidated cases brought seven counts against only one of the Smith & Wesson Defendants (Smith & Wesson Brands, Inc.) and the other four Defendants. *See Chupack v. Smith & Wesson Brands, Inc.*, No. 22-cv-6361 (Dckt. No. 1-2); *Turnipseed v. Smith & Wesson Brands, Inc.*, No. 22-cv-6359 (Dckt. No. 1-2). The complaints in those cases combine the counts based on the ICFA, and combine the battery and assault counts against Crimo III. *See Chupack*, No. 22-cv-6361 (Dckt. No. 1-2, at ¶¶ 159–231); *Turnipseed*, No. 22-cv-6359 (Dckt. No. 1-2, at ¶¶ 158–230). They do not assert a claim under the Illinois Uniform Deceptive Trade Practices Act, and do not assert an aiding and abetting claim against the two gun dealers. *Id.* They also do not bring intentional infliction of emotional distress and negligent infliction of emotional distress claims against all Defendants. *See Chupack*, No. 22-cv-6361 (Dckt. No. 1-2, at ¶¶ 214–24); *Turnipseed*, No. 22-cv-6359 (Dckt. No. 1-2, at ¶¶ 213–23). Plaintiffs in three of the eleven other consolidated cases brought additional counts against the seven Defendants. *See Toledo v. Smith & Wesson Brands, Inc.*, No. 22-cv-6191 (Dckt. No. 1-2) (eighteen counts); *Straus ex rel. Straus v. Smith & Wesson Brands, Inc.*, No. 22-cv-6181 (Dckt. No. 1-2) (fifteen counts); *Sundheim ex rel. Sundheim v. Smith & Wesson Brands, Inc.*, No. 22-cv-6178 (Dckt. No. 1-2) (fifteen counts). The additional counts are survival and wrongful death claims brought by estate administrators on behalf of deceased individuals.

## Legal Standard

"Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *United States v. Wahi*, 850 F.3d 296, 299 (7th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

"When a plaintiff files suit in state court but could have invoked the original jurisdiction of the federal courts, the defendant may remove the action to federal court."  *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (citing the removal statute, 28 U.S.C. § 1441(a)); *see also Velsicol Chem. LLC v. Magnetek, Inc.*, 2017 WL 2311245, at *2 (N.D. Ill. 2017).  The party seeking removal has the burden to demonstrate subject matter jurisdiction.  *See Schur*, 577 F.3d at 758.

"[F]ederal courts should interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court."  *Id.*  Under "long-established precedent . . . the removal statutes are to be strictly construed to preserve the limited jurisdiction of federal courts."  *Morris v. Nuzzo*, 718 F.3d 660, 670 (7th Cir. 2013); *see also Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002).

The reason for the judicial reluctance involves a mix of federalism and the longstanding tradition of federal courts exercising limited power.  Removal, after all, involves taking a case out of the hands of one sovereign and placing it in the hands of another.  *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 18 (2003) (Scalia, J., dissenting) (noting "our long tradition of respect for the autonomy and authority of state courts"); *see also Healy v. Ratta*, 292 U.S. 263, 270 (1934) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the

precise limits which the statute has defined."); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09 (1941) (noting that the policy underlying the removal statute "is one calling for the strict construction of such legislation").

A federal court must remand a case back to state court if it lacks jurisdiction. *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). A case can't stay here if it doesn't belong here.

### Analysis

Smith & Wesson relied on four jurisdictional bases when it removed each of the consolidated cases to federal court. The first basis involves the federal officer removal statute, 28 U.S.C. § 1442. The second basis is federal question jurisdiction under 28 U.S.C. § 1331 based on an embedded federal question under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). The third basis is federal preemption. The fourth basis is the artful pleading doctrine.

The Court will address each proffered justification for removal, one by one. And then, the Court will close the loop on one final point: whether removal was defective because Smith & Wesson did not obtain the consent of all Defendants.

### I.      Federal Officer Removal

The first question is whether Smith & Wesson can remove the case to federal court based on a statute about federal officers.

Congress gave special latitude to federal officers to remove cases to federal court. The federal officer removal statute permits removal to federal court by "[t]he United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of

any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." *See* 28 U.S.C. § 1442(a)(1) (emphasis added). As the text reveals, the statute covers federal officers, as well as anyone "acting under that officer." *Id.*

Ordinarily, courts interpret the removal statutes narrowly. *See Schur*, 577 F.3d at 758. But the interpretive winds blow in the other direction when it comes to the federal officer removal statute. Courts construe the federal officer removal statute liberally, not strictly. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) ("The presumption against removal in ordinary diversity jurisdiction cases does not extend to the federal officer removal statute."); *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 526–27 (7th Cir. 2018).

The presumption against removal "does not extend to cases in which there is a contrary congressional policy favoring removal." *Hammer*, 905 F.3d at 526. And the "Supreme Court has repeatedly found such a policy" when it comes to removal by federal officers. *Id.* at 527. "The federal officer removal statute is not 'narrow' or 'limited,'" *Willingham v. Morgan*, 395 U.S. 402, 407 (1969), and the statute must be "liberally construed," *Watson*, 551 U.S. at 147. Congress paved the way for easy removal by federal officers, and courts are leery of blocking the road.

To state the obvious, Smith & Wesson is not the United States, a United States agency, or an officer of the United States or any of its agencies. So, to fall within the federal officer removal statute, it must fit within the "acting under" language. *See* 28 U.S.C. § 1442(a)(1). That is, Smith & Wesson may remove the case if it "was 'acting under' any 'agency' or 'officer' of 'the United States'" when "carrying out the 'act[s]' that are the subject of the [plaintiff's]

10

complaint." *Watson*, 551 U.S. at 147 (first alteration in original) (quoting 28 U.S.C. § 1442(a)(1)).

The Seventh Circuit has developed a four-part test to determine if a defendant may invoke the statute's "acting under" provision. "Federal officer removal is proper when the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Betzner*, 910 F.3d at 1015; *see also Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020).

Step one is a short walk. The Seventh Circuit has held that companies and corporations are persons under the statute. *See Baker*, 962 F.3d at 941 (citing *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)). The statute is not limited to natural persons.

At step two, the Court must look to the relationship between the defendant seeking to remove the case (on the one hand) and the United States, its agencies, or its officers (on the other). Not just any relationship will do. "The relevant relationship is that of a private person '*acting under*' a federal 'officer' or 'agency.'" *Watson*, 551 U.S. at 151 (emphasis in original) (quoting 28 U.S.C. § 1442(a)(1)). "Typically, '[t]hat relationship . . . involves subjection, guidance, or control. In addition, precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Baker*, 962 F.3d at 942 (emphasis and alterations in original) (quoting *Watson*, 551 U.S. at 151–52).

To fall within the federal officer removal statute, the private person must help or assist a federal officer in carrying out his duties. But "the help or assistance necessary to bring a private

11

person within the scope of the statute does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original).

The Supreme Court gave some everyday examples in *Watson*. Imagine "[t]axpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking," and "for that matter well-behaved federal prisoners." *Id.* In some sense all of these people "'help' or 'assist' federal law enforcement authorities." *Id.*

The Internal Revenue Service depends on voluntary compliance. Airline passengers who refrain from smoking reduce the need for federal enforcement of the nonsmoking regulation. And well-behaved federal prisoners may reduce the need for law-enforcement action by the Bureau of Prisons.

But none of them can rely on the federal officer removal statute as a basis for federal jurisdiction. "One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as *compliance* with the law (or *acquiescence* to an order), not as 'acting under' a federal official who is giving an order or enforcing the law." *Id.* (emphasis in original).

Ordinary people who comply with federal statutes and regulations are not "acting under" an officer of the United States. Otherwise, just about everyone acts under federal officers. The argument would prove too much.

The same is true of business entities in complex industries. "[A] highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if

12

the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153.

Regulation alone does not establish jurisdiction under the statute. It is not enough to invoke "an extensive regime of regulations and directives." *DeAngelo v. Artis Senior Living of Elmhurst, LLC*, 2022 WL 3357276, at *5 (N.D. Ill. 2022). Despite complying with extensive regulation, a removing defendant will "nonetheless remain[] [a] private service provider[]" unless it can demonstrate that it "was helping to carry out the duties of a federal superior." *Id.*

After all, "regulation is ubiquitous, and much regulation can be called complex; if following federal rules allowed litigation in federal court, then all food and drug suits, and many others too, would be removable." *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 809 (7th Cir. 2015). Permitting regulatory compliance to act as the hook for removal under section 1442(a) "would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Watson*, 551 U.S. at 153.

Instead, the removing defendant must "provide aid in law enforcement, such as a local police officer who accompanies a federal agent on a drug raid and acts under the federal agent's direction." *Lu Junhong*, 792 F.3d at 809. Acting under a federal official also "includes situations 'where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.'" *Betzner*, 910 F.3d at 1015 (quoting *Ruppel*, 701 F.3d at 1181).

"Government contractors are a classic example." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021). When "a private contractor helps 'the Government to produce an item that it needs, the assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'"

*Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 153). And even then, a government contractor acts under a federal official only "when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. The private party must "work[] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel*, 701 F.3d at 1181.

"On the other hand, 'merely being subject to federal regulations or performing some functions that the government agency controls is not enough to transform a private entity into a federal officer.'" *Betzner*, 910 F.3d at 1015 (quoting *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016)). Even a company subject to "intense regulation" does not act under a federal official unless the company also "helps [government] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153.

It also is not enough to "certif[y] compliance" with regulations "and in the process reduce[] the size of the federal bureaucracy." *Lu Junhong*, 792 F.3d at 809. "The list of people who have to certify things is exceedingly long. . . . We doubt that the Justices would see a dispositive difference between certified compliance and ordinary compliance." *Id.* at 810.

So, section 1442(a) does not "cover the activities of regulated businesses," standing alone. *Id.* at 809. The federal officer removal statute does not blow a gaping hole through the guardrails limiting the jurisdiction of the federal courts, even if the removal statute is interpreted liberally. To fall within the statute, the regulated business must help or assist an officer of the United States in performing official duties.

Smith & Wesson argues that it is entitled to remove this case because it acted under the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), a federal agency. It contends

14

that it satisfies the federal officer removal statute's "acting under" provision because of "the unique, symbiotic manufacturer-ATF partnership created by the federal firearms laws." *See* Defs.' Resp., at 4 (Dckt. No. 48).

According to Smith & Wesson, "[c]ertain government functions are designated to manufacturers (e.g., tracing crime guns, collecting certain taxes, and maintaining registration and transfer records), while others are performed by the ATF." *Id.* These duties – "taxation, registration, and identification" – "were mandatory, performed on behalf of the ATF, and would have been performed by the ATF had they not been delegated." *Id.*

From the get-go, Smith & Wesson's argument runs into trouble. Smith & Wesson points to three federal firearms *regulations* to argue that it acted under a federal officer. All three requirements involve the collection of firearm records. The fact that Smith & Wesson must comply with federal regulations does not mean that Smith & Wesson is "acting under" a federal "officer" or "agency." *See* 28 U.S.C. § 1442(a)(1).

The three federal regulations at issue require a licensed firearms manufacturer to keep certain records. Federal law requires "[e]ach licensed importer, licensed manufacturer, and licensed dealer" to "maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe." *See* 18 U.S.C. § 923(g)(1)(A). The federal government may review these records only under certain circumstances. *Id.* § 923(g)(1)(A), (g)(1)(B).

The first regulation involves maintaining records related to firearm *registration*. *See* Defs.' Resp., at 4 (Dckt. No. 48). A federal regulation provides that "each licensed manufacturer shall record the name of the manufacturer and importer (if any), type, model, caliber or gauge,

and serial number (including any associated license number either as a prefix, or if remanufactured or imported, separated by a semicolon) of each firearm manufactured or otherwise acquired (including a frame or receiver to be disposed of separately), the date of such manufacture or other acquisition, and if otherwise acquired, the name and address or the name and license number of the person from whom it was received." *See* 27 C.F.R. § 478.123(a).

The regulation also dictates how a manufacturer must store the information. *Id.* It must keep separate records for "each firearm disposed of by a manufacturer" and "armor piercing ammunition dispositions to governmental entities." *Id.* § 478.123(b).

The second regulation involves maintaining records related to firearm *transactions*. *See* Defs.' Resp., at 4 (Dckt. No. 48). A "licensed manufacturer . . . shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record." *See* 27 C.F.R. § 478.124(a). Licensed manufacturers must retain these records. *Id.* § 478.124(b). They also must keep records for the "over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located." *Id.* § 478.124(c)(1).

The third regulation involves maintaining records related to firearm *receipt and disposition*. *See* Defs.' Resp., at 4 (Dckt. No. 48). Federal regulations require licensed firearms dealers to "enter into a record each receipt and disposition of firearms." *See* 27 C.F.R. § 478.125(e). Once again, the regulation specifies the required format. *Id.* And special records apply to armor-piercing ammunition sales. *Id.* § 478.125(a)–(d).

Smith & Wesson argues that complying with these regulations was "mandatory" and "performed on behalf of the ATF." *See* Defs.' Resp., at 4 (Dckt. No. 48). It argues that complying with these regulations "advance[d] distinctly federal objections" including "giv[ing]

force and effect to the ATF's determinations about which weapons qualify" as machineguns under federal law. *Id.* at 5.

The argument goes nowhere. All regulations are mandatory. Regulatory compliance is not the same thing as aiding or helping a federal officer carry out his official duties.

"*Compelling an industry to engage in a particular act is regulation*. It is not delegation or direction of the sort that would compel a conclusion that the defendants were 'acting under' a federal officer so as to justify removal." *See* 16 James W. Moore *et al.*, Moore's Federal Practice § 107.100(4)(b)(iii) (3d ed. 2022) (emphasis added).

This case fits squarely within the Supreme Court's decision in *Watson*. There, plaintiffs "filed a civil lawsuit in Arkansas state court claiming that the Philip Morris Companies, the [defendants], violated state laws prohibiting unfair and deceptive business practices" when manufacturing cigarettes. *Watson*, 551 U.S. at 146. Plaintiffs contended that Philip Morris "had cleverly manipulated the testing of its products to show low levels of tar and nicotine." *Lu Junhong*, 792 F.3d at 809 (describing *Watson*).

Philip Morris removed the case to federal court, invoking section 1442(a). *See Watson*, 551 U.S. at 146. It contended that it was acting under a federal official because "it had tested [its products] exactly as federal officials required and that any deviation from those protocols was forbidden." *Junhong*, 792 F.3d at 809.

The Supreme Court disagreed. "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Watson*, 551 U.S. at 153.

17

*Watson* snuffs out any possibility that Smith & Wesson acted as a federal officer. The gun industry, like the cigarette industry, is heavily regulated. Like Philip Morris, Smith & Wesson argues that it can remove state-law tort claims to federal court because it had to comply with regulations. But regulatory compliance alone won't cut it. If federal regulations about cigarettes don't create a basis for the federal officer removal statute, then federal regulations about firearms don't create a basis, either.

It is hard to see a limiting principle, too. The federal government has a vast reach into the economy, and into untold corners of daily life. If compliance with a federal regulation were enough to fall within the removal statute, the flood of cases flowing from state to federal court would reach biblical proportions. *Id.* ("A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.").

The Seventh Circuit has demonstrated what it means to act under a federal officer. For example, in *Baker*, the Seventh Circuit held that industrial manufacturing companies acted under federal officials when they "provided the federal government with materials that it needed to stay in the fight at home and abroad – namely, lead, zinc oxide, and white lead carbonate, used in turn to manufacture products like rubber, paint, ammunition, die casts, and galvanized steel." *See Baker*, 962 F.3d at 942.

One of the companies was a government contractor "under contract with the United States military itself for the procurement of zinc oxide." *Id.* And all the companies produced materials that the government otherwise would "have had to manufacture . . . on its own." *Id.* That relationship made *Baker* "not simply a case of compliance, but *assistance*." *Id.* (emphasis in original).

18

Likewise, in *Betzner*, the Seventh Circuit held that Boeing could remove a case under section 1442(a) as a military supplier. Boeing "contracted to manufacture heavy bomber aircraft for the United States Air Force," and in doing so "it acted under the military's detailed and ongoing control." *See Betzner*, 910 F.3d at 1015. So, Boeing adequately alleged "that it was assisting or carrying out the duties of the United States Air Force," a federal agency. *Id.*

*Baker* and *Betzner* fit comfortably within *Watson*'s requirement that the private company was a "private contractor . . . helping the Government to produce an item that it needs." *Watson*, 551 U.S. at 153. Smith & Wesson sits somewhere on the other end of the spectrum. When recording the information required by 27 C.F.R. §§ 478.123–.125, Smith & Wesson was complying with federal law. *Id.* at 152. But it was not helping the ATF carry out a governmental function and acting under a federal officer.

Smith & Wesson points out that, if gun manufacturers did not keep the records, the ATF would have to bridge the gap and do the job itself. *See* Defs.' Resp., at 4 (Dckt. No. 48). Again, that argument blurs together compliance with a regulation and performance of a government function. It is not enough to "reduce[] the size of the federal bureaucracy." *Lu Junhong*, 792 F.3d at 809. "*Every* regulated firm must use its own staff to learn whether it has satisfied federal regulations." *Id.* (emphasis in original). A private company cannot hang its hat on regulatory compliance that enables a federal agency to "have a smaller workforce" or "cut the [agency's] payroll." *Id.*

Smith & Wesson makes two additional arguments for why it can remove under the federal officer removal statute. Neither is persuasive.

First, Smith & Wesson points to an "Open Letter to All Federal Firearms Licensees" from the ATF, published in January 2004. *See* ATF Open Letter (Dckt. No. 48-5). In the letter,

19

the ATF said that it "is responsible for enforcing the Federal firearms laws, regulating the firearms industry, and promoting community outreach in an effort to reduce violent firearms crime." *Id.* at 1. Federal firearms licensees "play a vital role in this effort." *Id.*

The ATF's letter "emphasize[d] the importance of the partnerships that have been established between ATF and the firearms industry and . . . reinforce[d those parties'] joint responsibilities under the Gun Control Act (GCA)." *Id.* The ATF explained that it has "always viewed this as a partnership between industry and Government and continue[d] to do so." *Id.* at 2.

The letter continued. Federal firearms licensees are "an active partner in the fight against crime," and therefore "need to *comply with all Federal laws and regulations* that govern your firearms business." *Id.* at 1 (emphasis added). Failure to comply with these regulations could lead to "a number of possible consequences, including recommendations for warning letters, warning conferences, and – in instances of willful offenses – license revocation or criminal prosecution." *Id.* "In order to achieve our shared goal of ensuring proper and accurate business practices, ATF must take appropriate administrative or criminal action when voluntary compliance is not achieved." *Id.* at 1–2.

The message was clear: ATF requires federal firearms licensees to comply with federal laws and regulations. "ATF remains committed to assisting licensees in *complying* with the Federal firearms laws." *Id.* at 2 (emphasis added).

The ATF's nearly two-decades old letter does not establish that Smith & Wesson acted under a federal official. If anything, the letter reinforces that Smith & Wesson was required to comply with ATF *regulations*. The letter mentioned the need for compliance, and the possible sanctions for noncompliance.

20

The ATF simply used a figure of speech when it referred to the gun industry as its partner. Figures of speech are not enough to establish federal jurisdiction. For example, "[j]udges often call lawyers 'officers of the court,' but no one should think that this means that a lawyer can use § 1442 to remove a state-law malpractice suit to federal court." *Lu Junhong*, 792 F.3d at 809. "A figure of speech does not make someone a federal officer or a person 'acting under' one." *Id.* at 809–10.

Second, Smith & Wesson mentioned that it has "duties regarding taxation" under federal law. *See* Defs.' Resp., at 4 (Dckt. No. 48). Smith & Wesson does not cite any federal statute or regulation. However, federal law does require the collection of certain firearm-specific taxes. *See, e.g.*, 26 U.S.C. § 5811(a) ("There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845(e) shall be at the rate of $5 for each such firearm transferred.").

Regardless, the argument is a nonstarter. The Supreme Court put it plainly in *Watson*: paying your taxes is not enough to act under a federal official. *See Watson*, 551 U.S. at 152. Lots of companies play a role in collecting taxes, too (ever get a W-2?). The fact that taxes are specific to firearms transactions makes no difference. Smith & Wesson was complying with federal law, not helping a federal officer meet a governmental objective.

In sum, Smith & Wesson was not acting under a federal officer when it complied with the ATF's firearm registration and reporting regulations. So, it cannot invoke section 1442(a) as a private company "acting under" a federal officer.

## II. Federal Question Jurisdiction

Next, Smith & Wesson argues that federal question jurisdiction exists under 28 U.S.C. § 1331. District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331.

The issue turns on whether the complaint includes an embedded federal question within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). To set the scene, the Court will start with an overview of the requirements for federal question jurisdiction. Then, the Court will address each of the claims.

The punchline is that this Court lacks federal question jurisdiction. There is no federal cause of action, and the complaint cannot travel down the narrow path paved in *Grable*.

### A. Overview of Federal Question Jurisdiction

"The Supreme Court has recognized two ways in which a case can arise under federal law and satisfy § 1331." *E. Cent. Illinois Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 958 (7th Cir. 2021). "A case arises under federal law within the meaning of § 1331 . . . if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthcare Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690–91 (2006) (cleaned up).

Section 1331 creates two avenues to the federal courthouse, and the first path is the widest and the most direct route. A case arises under federal law "when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). That is, federal question jurisdiction exists when a federal cause of action appears "on the face of [the] complaint." *Prather Plumbing*, 3 F.4th at 958.

22

A federal defense to a state-law claim typically does not give rise to federal question jurisdiction. "[A] state law claim ordinarily cannot be removed, even if it is necessarily defeated by a federal defense, because the federal question supporting jurisdiction must appear on the face of the plaintiff's properly or 'well-pleaded' complaint." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers*, 966 F.3d 661, 669 (7th Cir. 2020) (citation omitted).

Here, the parties agree that the complaint does not include a federal cause of action. *See* Notice of Removal, at ¶¶ 36–41 (Dckt. No. 1); Pls.' Mtn. to Remand, at 8–13 (Dckt. No. 26). The complaint includes 11 state-law claims, and no federal law claims. *See* Cplt., at ¶¶ 158–336 (Dckt. No. 1-2).

So, the first route to the federal courthouse is blocked. And "[t]his category – lawsuits raising federal causes of action – 'accounts for the vast bulk of suits that arise under federal law." *Prather Plumbing*, 3 F.4th at 959 (quoting *Gunn*, 568 U.S. at 257). The only route left is the road less traveled.

"The second way of meeting the arising-under requirement is much narrower." *Id.* The second route is the "so-called . . . 'embedded' federal question." *Sarauer*, 966 F.3d at 669. The Supreme Court pointed the way in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

Under *Grable*, "[a] case arises under federal law within the meaning of § 1331" if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthcare Assurance*, 547 U.S. at 690–91 (cleaned up). That is, federal question jurisdiction exists if a federal question is embedded in a state-law cause of action. A federal court can hear a case if a federal question is baked into the middle of the state-law claim.

Embedded federal question cases are rare. The Supreme Court has described them as a "special and small category" of cases. *See Gunn*, 568 U.S. at 258 (quoting *McVeigh*, 547 U.S. at 699). The opening for federal jurisdiction "is exceedingly slim." *Prather Plumbing*, 3 F.4th at 963; *see also Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 466 (7th Cir. 2015) (describing embedded federal questions as a "slim category"). The "existence of a federal issue" embedded in a state-law claim "rarely allows removal." *Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1035 (7th Cir. 2014); *see also Webb v. Fin. Indus. Regul. Auth., Inc.*, 889 F.3d 853, 860 (7th Cir. 2018) ("Federal jurisdiction is rarely established on this basis."); *Praschak v. Kmart Corp.*, 922 F. Supp. 2d 710, 713 (N.D. Ill. 2013) (noting that embedded federal question jurisdiction is a "rare case"). Words like "special," "small," "slim," and "rare" don't leave a lot of room to enter the doors of the federal courthouse.

In *Grable*, the IRS seized real property belonging to Grable & Sons Metal Products, Inc. and sold it to satisfy Grable's federal tax delinquency. *See Grable*, 545 U.S. at 310. Darue Engineering and Manufacturing purchased the property in the IRS's sale. *Id.* at 310–11. Five years later, Grable sued Darue in state court. *Id.* at 311. Grable brought a state-law quiet title action, "claiming that Darue's record title was invalid because the IRS had failed to notify Grable of its seizure of the property in the exact manner required by [26 U.S.C.] § 6335(a), which provides that written notice must be 'given by the Secretary to the owner of the property [or] left at his usual place of abode or business.'" *Id.* (second alteration in original).

Darue removed the case to federal court, arguing that Grable's state-law claim presented a significant question of federal law. *Id.* The Supreme Court agreed.

Grable's case presented a single issue: whether the IRS complied with section 6335(a)'s notice requirement before seizing Grable's property to satisfy the tax lien. And that question

24

turned entirely on the meaning of the federal statute. *Id.* at 315 ("Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case.").

A federal question was the whole ballgame. If the IRS did *not* comply with section 6335(a), then Grable did not receive the required notice, and the sale to Darue was invalid. If the IRS *did* comply with section 6335(a), then Grable did receive the required notice and the sale was valid. In other words, the state-law claim necessarily raised a federal question, even though it was not a federal cause of action *per se*.

The fact that the case necessarily raised a federal question was an important factor. But it wasn't enough. The Supreme Court recognized other requirements before a complaint with state-law claims can enter the federal courthouse. The importance of the federal question matters. So does the impact on the balance of power between the federal government and the states.

"The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court." *Id.* That is, the state-law claim raised a "substantial question[] of federal law." *Id.* at 312. And "because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor." *Id.* at 315. So, Grable's claim would not disrupt the balance between the federal and state courts, partly because it was "rare" and would have "microscopic" effects.

In later cases, the Supreme Court has distilled *Grable* into four factors. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually

25

disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (citing *Grable*, 545 U.S. at 313–14).

A complaint gets by step one of *Grable* if the federal issue is "necessarily raised on the face of plaintiff's complaint." *Sarauer*, 966 F.3d at 674. It must be "impossible to decide" the state-law claim without deciding an issue of federal law. *Hartland Lakeside*, 756 F.3d at 1035. To meet the requirements of *Grable*, "[d]eciding an issue of federal law" must be "inescapable." *Id.* There must be no way out, except through the door of federal law.

"To be 'necessarily raised' for purposes of federal-question jurisdiction, the answer to the federal question must be an essential element of the state cause of action. If the case can be resolved without reaching the federal issue, the federal question is not necessarily raised." *See* 15A James W. Moore *et al.*, Moore's Federal Practice § 103.31(4)(g)(ii) (3d ed. 2022).

A plaintiff's state-law claim raises a federal issue "only if" an issue of federal law must be resolved. *Sarauer*, 966 F.3d at 674; *see also Illinois ex rel. Elder v. JPMorgan Chase Bank, N.A.*, 552 F. Supp. 3d 812, 817–18 (N.D. Ill. 2021) ("To prevail on his claim, relator must establish those reports were false. Those reports, however, could have been false *only* if relator is correct that the property was subject to escheat in Illinois, rather than Ohio, i.e., that cashier's checks are, as relator asserts, 'similar written instruments' under 12 U.S.C. § 2503. That is something relator must establish to prevail on his claim under [state law]. A federal question is necessarily raised by relator's claims.") (emphasis in original).

"A federal issue may not be necessarily raised even if the predominant issue concerns federal law." *See* Moore, *supra*, § 103.31(4)(g)(ii). "Federal law must be dispositive of the case

to give rise to federal jurisdiction." *Illinois ex rel. Elder v. U.S. Bank N.A.*, 2021 WL 4942041, at *3 (N.D. Ill. 2021).

In *Grable*, "[t]he Court held that [Grable's quiet title action] arises under federal law because, apart from the procedural device (a quiet-title action), there was *nothing* in it but federal law, with the potential to affect the national government's revenues." *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 910 (7th Cir. 2007); *see also Hartland Lakeside*, 756 F.3d at 467 (holding that *Grable* step one was met because "[w]hile state law may create the breach-of-contract causes of action, *the only disputed issues* involve the proper interpretation of Section 8 and HUD's implementing guidance") (emphasis added); *Rosenberg v. Advoc. Health & Hosps. Corp.*, 2011 WL 1548391, at *5 (N.D. Ill. 2011) ("Unlike *Grable* and like *Bennett*, Rosenberg's suit is not one in which the only contested issue is a question of federal law.").

The existence of a federal question is necessary, but not sufficient, to give rise to federal question jurisdiction under *Grable*. For example, *Grable* itself noted that state-law tort claims often point to violations of federal law as evidence of negligence. But a case is not removable simply because federal law might come into play when litigating a state-law claim.

"One only need[s] to consider the treatment of federal violations generally in garden variety state tort law. The violation of federal statutes and regulations is commonly given negligence per se effect in state tort proceedings." *Grable*, 545 U.S. at 318 (quotation marks omitted). But "[a] general rule of exercising federal jurisdiction *over state claims resting on federal mislabeling and other statutory violations* would thus have heralded a potentially enormous shift of traditionally state cases into federal courts." *Id.* at 319 (emphasis added).

These "'garden variety state tort law' claims that borrow standards of care from federal law are so numerous that they cannot be deemed subject to federal question jurisdiction." *Ward*

*v. Soo Line R.R. Co.*, 901 F.3d 868, 875 (7th Cir. 2018) (quoting *Grable*, 545 U.S. at 318).

Under *Grable*, "it takes more than a federal element 'to open the arising under door.'" *McVeigh*,

547 U.S. at 701 (quoting *Grable*, 545 U.S. at 313).

The Seventh Circuit underscored the point in *Bennett*, a case involving an airline

accident. "[T]he influence of federal law on the outcome of a contract (or tort) suit is not enough

to support the arising-under jurisdiction." *Bennett*, 484 F.3d at 910. When the state-law claim

presents "a fact-specific application of rules that come from both federal and state law rather

than a context-free inquiry into the meaning of a federal law," then the case does not necessarily

raise a federal issue within the meaning of *Grable*. *Id.*

"That some standards of care used in tort litigation come from federal law does not make

the tort claim one 'arising under' federal law." *Id.* at 912; *see also Schumacher v. Sterigenics*

*U.S., LLC*, 394 F. Supp. 3d 837, 843 (N.D. Ill. 2019) (noting that the Seventh Circuit has

"rejected the argument that the potential relevance of federal standards to state law negligence

claims can cause the claims to arise under federal law"); *Navistar Int'l Corp. v. Deloitte &*

*Touche LLP*, 837 F. Supp. 2d 926, 930 (N.D. Ill. 2011) ("The mere fact that Navistar alleges that

Deloitte violated federal standards does not, by itself, give rise to *Grable* jurisdiction.").

A complaint trips at step one of *Grable* when "none of Plaintiffs' claims *require proof*

*that a federal law was violated.*" *Schumacher*, 394 F. Supp. 3d at 843 (emphasis added). So,

"even if the application of a federal standard of care were a substantial federal issue . . . it is

certainly not one 'necessarily raised' in a complaint, as *Grable* requires." *Id.* at 844. If a

plaintiff's state-law claim could succeed "without reference to any federal statute" or other

source of federal law, then there is no embedded federal question. *Id.* at 845.

By the same token, when a claim has multiple theories, all of the theories must present embedded issues of federal law to satisfy *Grable*. "If the plaintiff can support her state-law claim with theories unrelated to the federal statute, then the state-law claim does not arise under federal law." *Praschak*, 922 F. Supp. 2d at 713. "[A] claim supported by alternative theories in the complaint may not provide the basis for federal question jurisdiction unless federal law is essential to each of the theories." *See* 13D Charles Alan Wright *et al.*, Federal Practice and Procedure Jurisdiction § 3562 (3d ed. 2023); *see also Anghel v. Ruskin Moscou Faltischek, P.C.*, 598 F. App'x 805, 807 (2d Cir. 2015) ("Where a federal issue is present as only one of multiple theories that could support a particular claim . . . this is insufficient to create federal jurisdiction.") (quotation marks omitted).

The Supreme Court made a similar point in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). The Supreme Court rejected Merrill Lynch's argument that "whenever . . . a plaintiff's complaint either explicitly or implicitly asserts that the defendant breached an Exchange Act duty, then the suit is brought to enforce that duty and a federal court has exclusive jurisdiction." *Id.* at 381 (cleaned up). That holding shed light on *Grable*, because the jurisdictional test under section 27 of the Securities Exchange Act of 1934 "is the same as the one used to decide if a case 'arises under' a federal law." *Id.* at 377 (quoting 28 U.S.C. § 1331); *see also Webb*, 889 F.3d at 860 (noting that *Manning* held that "the *Grable & Sons* test determines the reach of 'arising under' jurisdiction for purposes of the jurisdictional grant in the Securities Exchange Act of 1934").

The Supreme Court in *Merrill Lynch* gave an example of a state-law cause of action that did not raise a federal issue under *Grable*. "Consider, for example, a simple state-law action for breach of contract, in which the plaintiff alleges, for atmospheric reasons, that the defendant's

conduct also violated the Exchange Act – or still less, that the defendant is a bad actor who infringed that statute on another occasion." *Id.* at 381–82.

Despite the reference to federal law, at the end of the day, "that hypothetical suit is brought to enforce state contract law, not the Exchange Act." *Id.* at 382 (quotation marks omitted). "[T]he plaintiff can get all the relief he seeks just by showing the breach of an agreement, without proving any violation of federal securities law. The suit, that is, can achieve all it is supposed to even if issues involving the Exchange Act never come up." *Id.*; *see also Virginia ex rel. Hunter Lab'ys, LLC v. Virginia*, 828 F.3d 281, 288 (4th Cir. 2016) (holding that for a state-law claim to necessarily raise a federal issue, "every theory of relief must raise [a] federal issue for [the] claim to arise under federal law").

In sum, a case does not belong in the federal courthouse simply because a federal question might come up. A case falls within *Grable* only if it involves an inescapable federal question that demands an answer. If the court or the jury could step around the federal question, then the complaint does not get past step one of *Grable*. And even if a federal question is inescapable, *Grable* includes other steps before a complaint can get to the federal courthouse.

## B. The Complaint

After setting the scene, the Court now turns to the complaint at hand.

Smith & Wesson believes that this case can travel the narrow path laid down in *Grable*. As Smith & Wesson sees it, a federal issue is "necessarily raised" because the Court "must adjudicate the meaning and application of the NFA [*i.e.*, the National Firearms Act] to resolve Plaintiffs' claims." *See* Defs.' Resp., at 11 (Dckt. No. 48). Smith & Wesson believes that "Plaintiffs transparently seek an order requiring Smith & Wesson to disclose that the M&P rifle is an NFA weapon." *Id.* at 12.

30

The complaint includes 11 state-law claims, but there is a sprinkling of federal law, too. It spans 336 paragraphs, and 14 of the 336 paragraphs mention the National Firearms Act (plus three other paragraphs that apply to the gun shops only). *See* Pls.' Mtn. to Remand, at 4 (Dckt. No. 26); *see also* Cplt., at ¶¶ 45–46, 52, 168, 174, 189–91, 212–214, 238, 240–41 (Dckt. No. 1-2). The complaint supports the state-law tort claims by alleging that Smith & Wesson violated federal law on the manufacture, transfer, and sale of the M&P15.

The first references to federal law merely describe parts of the National Firearms Act. *See* Cplt., at ¶¶ 45–46 (Dckt. No. 1-2). The NFA defines what qualifies as a "machinegun," *see* 26 U.S.C. § 5845(b), and "[i]t is a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process." *Id.* at ¶ 45.

The complaint then summarizes an ATF ruling from 1982. The ATF "clarified" that "semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with simple modification or elimination of existing component parts were machineguns under the NFA." *Id.* at ¶ 46 (quotation marks omitted).

A few paragraphs later, the complaint alleges that Smith & Wesson violated the NFA. "Smith & Wesson chose to design the M&P15 assault rifles with features that allow the rifles to be easily modified to fire automatically, *but manufactured, transferred and sold them in violation of the NFA and the Gun Control Act ('GCA')*, since the company failed to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and – most critically – register the firearms with the ATF." *Id.* at ¶ 52 (emphasis added). Smith & Wesson created the M&P15 by "essentially cop[ying] the design of the fully automatic weapon that is made for combat, not for any legitimate need of a law-abiding citizen." *Id.* at ¶ 53.

The fact that the complaint points to federal law is not enough to establish federal question jurisdiction. *See Merrill Lynch*, 578 U.S. at 381. It depends on the substance of the claims. So the Court will march through the individual claims, and determine if they necessarily raise questions of federal law.

A close look at the complaint confirms that the claims do not "necessarily raise" a federal question. The complaint does not satisfy the first step of *Grable*, let alone march down the other steps and get the rest of the way there.

### 1. The Statutory Tort Claims (Counts I, II, & III)

The Court will begin with the statutory claims. The complaint includes two claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (again, "ICFA"). Count I is an unfairness claim, and Count II is a deception claim. The third claim is under the Illinois Uniform Deceptive Trade Practices Act (Count III). *See* Cplt., at ¶¶ 158–224 (Dckt. No. 1-2). Each claim *mentions* federal law, but does not *turn* on federal law.

All three claims incorporate the complaint's general allegations, including the references to the NFA. *Id.* at ¶¶ 158, 179, 202. Each claim also includes additional allegations that Smith & Wesson violated federal law.

The unfairness claim under the ICFA (Count I) includes more than a dozen paragraphs about Smith & Wesson's marketing practices. *Id.* at ¶¶ 160–74. Most of the paragraphs have nothing to do with federal law. But a few paragraphs do mention federal law.

For example, Smith & Wesson "does not identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements." *Id.* ¶ 168. "Smith & Wesson violated both the NFA and the Gun Control Act . . . by manufacturing, transferring, and selling these weapons without filling out the

32

appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms." *Id.* at ¶ 174.

The deception claim under the ICFA (Count II) makes similar allegations. "Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed." *Id.* at ¶ 189. "Smith & Wesson's failure to identify their M&P rifles as NFA weapons" – an alleged violation of federal law – "qualifies as concealment, suppression, or omission of a material fact." *Id.* at ¶ 190. And "[u]pon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission." *Id.* at ¶ 191.

The claim under the Illinois Uniform Deceptive Trade Practices Act (Count III) repeats the allegations of Count II. *See id.* at ¶¶ 212–14.

So each claim includes references to federal law, here and there. Even so, the scattered references to federal law recede into the background when reading the claims as a whole. Most of the allegations have nothing to do with federal law. The complaint gives lots of reasons why Smith & Wesson violated the state statutes, and only some of the reasons involve federal regulations.

A jury could decide the statutory claims without reaching any question of federal law. A violation of federal regulations is a *possible* basis for violating the state statutes, but it is not a *necessary* basis for violating the state statutes. A federal question is not embedded because answering a federal question is not *unavoidable*. There is another way out.

Start with Plaintiffs' unfairness claim under the ICFA. Plaintiffs allege that Smith & Wesson's conduct was unfair because "Smith & Wesson sells and promotes its line of assault

rifles, which are designed for military and law enforcement personnel, by intentionally and unfairly targeting the propensity of young men for risk-taking, impulsive behavior." *Id.* at ¶ 161.

Smith & Wesson promised "young civilian men that these assault rifles will offer 'more adrenaline.'" *Id.* at ¶ 163. Smith & Wesson "models its marketing videos after first-person shooter games despite the risk that a certain subset of young men who play these games will want to act them out in real life." *Id.* at ¶ 164. The company also uses "social media posts that harness images and themes popular among young people like first-person shooter games" and social media "influencers" to market to "young civilian consumers." *Id.* at ¶¶ 165–66.

Plaintiffs allege that this "unfair marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence." *Id.* at ¶ 167.

Those allegations appear before the allegations that Smith & Wesson violated the NFA. They provide a potential hook for the jury to hang its hat on, without getting into federal law.

A jury could decide the claim without reaching whether Smith & Wesson violated the NFA. The complaint gives lots of other reasons why the marketing was unfair. Going down the road of federal law is not "inescapable." *Hartland Lakeside*, 756 F.3d at 1035; *Schumacher*, 394 F. Supp. 3d at 845 ("Plaintiffs' claims can succeed without reference to any federal statute.").

The complaint offers many reasons why Smith & Wesson violated the state statutes, and many of those reasons have nothing to do with federal law. The non-federal reasons provide, in effect, a *Grable* off-ramp. A jury doesn't need to decide a federal question to get from here to there, and the mere possibility of addressing federal law is not enough to blaze a path to the federal courthouse.

Smith & Wesson tries to downplay the non-federal reasons alleged in the complaint. In its view, "when stripped of the purported state-law bases that are insubstantial, implausible, or foreclosed by prior decisions of the Illinois Supreme Court, as this Court must do, the Complaint is necessarily based on federal issues." *See* Notice of Removal, at ¶ 38 (Dckt. No. 1).

But Smith & Wesson cannot ignore state-law theories in the complaint to establish federal question jurisdiction. "Defendants cannot establish federal jurisdiction by reading out of the complaint independent state law grounds that support the claims." *Collins v. Pontikes*, 447 F. Supp. 2d 895, 902 (N.D. Ill. 2006).

Smith & Wesson points to *New York v. Arm or Ally, LLC*, 2022 WL 17496413 (S.D.N.Y. 2022), but it does not lend a hand. There, the State of New York sued firearm manufacturers and sellers under a New York state law "which provides liability for gun industry members that either 'create, maintain or contribute to a condition in New York state that endangers the safety or health of the public.'" *Id.* at *3 (quoting N.Y. Gen. Bus. Law § 898-b(1)). The court held that this state-law claim necessarily raised a federal issue under *Grable*. *Id.* at *5–6.

The New York statute "applies to 'gun industry member[s]' who, among other things, sell a 'qualified product.'" *Id.* at *5 (quoting N.Y. Gen. Bus. Law § 898-b(1)). The term "qualified product" under state law has the same meaning as the term "qualified product" as defined by *federal law*. *Id.* (citing 15 U.S.C. § 7903(4)).

That is, a gun industry member sells a qualified product under New York state law *only if* that product meets the definition of "qualified product" under federal law. So, to answer the state-law question, the court *needed* to interpret a federal statute. "In order to prevail on its claim that Defendants' conduct falls under General Business Law § 898-b(1), therefore, the State *must demonstrate* that the products at issue in this case were 'firearms' or 'component parts' thereof

35

within the meaning of federal law." *Id.* (emphasis added).  The plaintiff could not prevail on its claim without the court first deciding a federal issue.

A claim under the ICFA differs from the claim under the New York statute.  Deciding a question of federal law is not a *necessary* part of an ICFA claim.  "The elements of a claim under the ICFA are:  (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 940 (7th Cir. 2021) (quotation marks omitted).  "In addition, to prevail under ICFA, a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *see also Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 769 (N.D. Ill. 2018).

To determine if a practice is "unfair," courts consider "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Leszanczuk*, 21 F.4th at 940 (cleaned up).  "All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (quotation marks omitted).

The question is whether a practice is "unfair," and one of the ways to make that showing is to demonstrate that the practice offends "public policy."  That is, a plaintiff could show that "it violates a standard of conduct embodied in a statute, the common law, or otherwise, *i.e.*, if it is within at least the penumbra of some common-law, statutory or other established concept of unfairness." *Id.* at 940–41 (quotation marks omitted).

A plaintiff *could* prove that a practice is unfair by showing that the practice violates public policy. But a plaintiff doesn't *have to* show that the practice violates public policy. *Id.* at 940. The practice could be "immoral," or "unethical," and so on. *Id.*

If the plaintiff *does* show that the practice violates public policy, the plaintiff *could* prove that the practice violates public policy by violating the law. But the plaintiff doesn't *have to* show that the practice violates public policy by violating the law. *Id.* at 940–41.

If the plaintiff *does* show that the practice violates public policy by violating the law, the plaintiff *could* prove that the practice violates public policy by violating *federal* law. But the plaintiff doesn't *have to* show that the practice violates public policy by violating federal law. A violation of state law would count, too. *See Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1316 (Ill. App. Ct. 1990) (noting that a practice can offend public policy "without necessarily having been previously considered unlawful" so long as "it is within at least the penumbra of some common-law, statutory or other established concept of unfairness"); *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 832 (7th Cir. 2014) ("*Although there was no specific statute prohibiting insurance companies from using polygraphs in this way*, the court thought the practice offended the policy against polygraphs 'as it has been established by statutes, the common law, or otherwise.'") (emphasis added) (quoting *Elder*, 558 N.E.2d at 1316).

Even if a jury did find a violation of federal law, the complaint still would not satisfy *Grable*. Again, a complaint does not arise under federal law within the meaning of *Grable* simply by relying on federal law as the standard of care. *See Bennett*, 484 F.3d at 912 ("That some standards of care used in tort litigation come from federal law does not make the tort claim one 'arising under' federal law.").

And on top of it all, the case involves more than a clean, legal question under federal law. A plaintiff must prove more than an unfair practice. An ICFA claim includes other elements, too, including reliance and proximate causation. *See Leszanczuk*, 21 F.4th at 940; *Siegel*, 612 F.3d at 935. The claim "is fact-bound and situation-specific," and does not "present a nearly pure issue of law." *McVeigh*, 547 U.S. at 700–01 (cleaned up). The unfair practices claim involves more than a clean, dispositive question under federal law, so it does not satisfy *Grable*.

Plaintiffs' claims about deceptive conduct under the two statutes (Counts II & III) do not satisfy *Grable*, either. Once again, deciding a question of federal law is not a necessary part of the claims.

Plaintiffs allege that Smith & Wesson's marketing was deceptive because it "associate[ed] its line of M&P rifles with United States military personnel to create the false impression that its products were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings." *See* Cplt., at ¶ 182 (Dckt. No. 1-2) (Count II); *see also id.* at ¶¶ 204–05 (Count III). Smith & Wesson's marketing "impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles, causing a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles." *Id.* at ¶ 187 (Count II); *see also id.* at ¶¶ 209–11 (Count III).

Again, these allegations come before the allegations that Smith & Wesson's conduct violated the NFA. *See id.* at ¶¶ 189–91, 212–14. And again, the allegations about deceptive conduct form a standalone theory that does not rely on federal law. Plaintiffs could prevail even if the jury never reaches a question of federal law.

Plaintiffs' deception claims also do not present a "nearly pure" issue of federal law.  *See McVeigh*, 547 U.S. at 700.  The legal framework for a deception claim is the same as the framework for an unfairness claim.  *See Phila. Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014).  "The elements of a claim under the Act are:  (1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deceptive act occurred in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deceptive act."  *Id.*

So again, the court will need to decide issues of state law, such as intent, damages, and causation.  And again, those issues are "fact-bound and situation-specific," and do not "present a nearly pure issue of law."  *McVeigh*, 547 U.S. at 700–01.

In sum, the claims under the Illinois statutes do not necessary raise a question of federal law.  A jury could decide the claims without reaching any issue of federal law.

### 2.      Negligence Claim (Count IV)

The next claim is negligence under Illinois law.  *See* Cplt., at ¶¶ 225–45 (Dckt. No. 1-2).  Once again, the complaint alleges that Smith & Wesson violated the NFA.

The negligence claim incorporates the complaint's general allegations, some of which allege that Smith & Wesson violated the NFA.  *Id.* at ¶ 225.  The complaint then makes additional allegations, echoing the statutory tort claims.

"Smith & Wesson knowingly violated both the NFA and the GCA by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms."  *Id.* at ¶ 238.  "Smith & Wesson marketed the rifle as not requiring NFA paperwork,

and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements." *Id.* at ¶ 240.

The complaint also linked these violations to the Highland Park shooting. "Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon." *Id.* at ¶ 241.

Federal law is in play, but it is not the only ball in play. The complaint gives a bunch of other reasons why Smith & Wesson was negligent. Those reasons have nothing to do with federal law.

Plaintiffs allege that "Smith & Wesson knows, or should know, that adolescents and young adults are more susceptible to claims made in advertising than older age groups." *Id.* at ¶ 231. So, "Smith & Wesson knows, or has reason to know, of the foreseeable risk that marketing of its M&P assault rifles to civilian adolescents and young adults using military and law enforcement imagery and references and appeals to increasing their adrenaline will inspire or encourage such consumers to choose M&P rifles for use in mass shootings." *Id.* at ¶ 234. According to the complaint, this allegation *alone* supports a finding that Smith & Wesson breached its duty of care. "Smith & Wesson has breached its duty of care by choosing – in the face of this foreseeable risk – to negligently and misleadingly market its M&P rifles to teenagers and young adults." *Id.* at ¶ 235.

That theory of liability – based on Smith & Wesson's use of military imagery targeted at young adults – stands apart from Plaintiffs' allegations about the NFA. Once again, Plaintiffs could prevail without establishing that Smith & Wesson violated the NFA's manufacturing and labeling requirements.

Plaintiffs allege that Smith & Wesson breached a duty of care by failing to comply with federal law. But under *Grable*, "federal violations generally in garden variety state tort law" do not raise a federal issue. *See Grable*, 545 U.S. at 318; *see also Bennett*, 484 F.3d at 912 ("That some standards of care used in tort litigation come from federal law does not make the tort claim one 'arising under' federal law."); *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1297–98 (11th Cir. 2008) (holding that a state-law negligence claim did not necessarily raise a federal issue despite plaintiffs' allegation that "defendants broke federal law" as a basis for liability).

Finally, Plaintiffs' state-law negligence claim presents unambiguously state-law issues, like damages. Here "[s]tate issues, such as the amount of damages, may well predominate." *Bennett*, 484 F.3d at 910. So, the case presents "a fact-specific application of rules that come from both federal and state law rather than a context-free inquiry into the meaning of a federal law." *Id.*

In sum, the negligence claim does not raise an embedded federal question.

### 3. Emotional Distress Claims (Counts X and XI)

Finally, the complaint includes claims of intentional infliction of emotional distress and negligent infliction of emotional distress. *See* Cplt., at ¶¶ 319–36 (Dckt. No. 1-2). Unlike the other claims, the emotional distress claims do not expressly allege a violation of federal law.

Both counts incorporate the complaint's allegations, including that Smith & Wesson violated the NFA. *Id.* at ¶¶ 319, 328. But neither count includes additional allegations stating that Smith & Wesson violated the NFA, or any other federal law. *Id.* at ¶¶ 319–36.

Instead, the complaint alleges that "[a]s set forth in the various counts against each Defendant, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr."

*Id.* ¶¶ 321, 330. "Each defendants' conduct was both extreme and outrageous," and "[a]s a direct and proximate result of the Shooter's conduct," the Plaintiffs "experienced emotional distress." *Id.* at ¶¶ 325, 334.

So, out of the gate, Plaintiffs do not include claim-specific allegations showing that there is an embedded federal question in their emotional distress claims.

Under Illinois law, the plaintiff must prove three elements to succeed on a claim for intentional infliction of emotional distress. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)). "To qualify as outrageous, the conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 859 (7th Cir. 2023) (quotation marks omitted).

Whether Smith & Wesson's conduct was extreme and outrageous is a question of state tort law. Even if Plaintiffs argue that Smith & Wesson's conduct was extreme and outrageous because it violated the NFA, Plaintiffs must still show that violating the NFA is conduct that is so extreme that it violates all possible bounds of decency tolerated in a civilized society. Whether the conduct was extreme and outrageous "is a factual matter that can be resolved without applying federal law." *Adventure Outdoors*, 552 F.3d at 1297.

Plaintiffs' claims for negligent infliction of emotional distress also do not raise embedded federal questions. A claim for negligent infliction of emotional distress is a common-law

42

negligence claim. So, the plaintiff must prove the elements of a negligence claim: duty, breach, causation, and damages.

Additionally, the plaintiff must show that they were either a direct victim of the negligent conduct or a bystander. "Direct victims are the persons that the negligent conduct has directly affected; they are the ones that are actually physically injured by the defendant's negligent conduct. To fall in this category the plaintiff must suffer some contemporaneous physical contact that caused the emotional distress. Meanwhile, bystanders are those who are in the zone-of-physical danger and who because of the defendant's negligence fear for their own safety, which caused them emotional distress and a physical injury or illness from the emotional distress." *Barnes v. Anyanwu*, 391 F. App'x 549, 552 (7th Cir. 2010).

Plaintiffs' claims for negligent infliction of emotional distress do not raise an embedded federal question for the same reasons that the common-law negligence claim does not. A negligent infliction of emotional distress claim is a negligence claim, but with the additional requirement that the plaintiff was a direct victim of the negligent conduct or a bystander.

This additional element of the claim does not raise an embedded federal question. Instead, it is a fact-bound question about the individual plaintiffs' injuries and physical proximity to the shootings. So, the state-law claim "is fact-bound and situation-specific." *McVeigh*, 547 U.S. at 701. It does not present a pure issue of federal law.

Plaintiffs' state-law emotional distress claims do not raise an embedded federal issue.

\*   \*   \*

In sum, Plaintiffs' state-law claims do not necessarily raise a federal issue within the meaning of *Grable*. So, this Court lacks federal question jurisdiction.

43

There are other factors under *Grable*, too. But the Court does not need to reach them because the claims do not get past step one. *See Webb*, 889 F.3d at 861 ("As for the rest of the *Grable & Sons* test, an issue not raised cannot be actually disputed or substantial, and without any federal question necessarily in play, we need not consider how taking the question would affect the federal-state balance.").

## III.  Preemption

Next, Smith & Wesson contends that this Court has jurisdiction because "Plaintiffs' state law claims are completely preempted." *See* Notice of Removal, at ¶ 16.d (Dckt. No. 1).

Smith & Wesson argues that the NFA and the Administrative Procedure Act "have completely displaced state law claims that require a state court to decide the classification of a firearm under federal law, particularly where, as here, the proposed classification conflicts with the ATF's longstanding interpretation of federal law." *See* Notice of Removal, at ¶ 16.d (Dckt. No. 1).

"The complete preemption doctrine refers to a limited set of cases in which a properly pled state law claim may be said to arise under federal law because Congress has effectively eliminated state law causes of action in the entire field." *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 894 (7th Cir. 2013).

The logic is simple, even if the law of preemption is not. If federal law completely preempts state law over an entire field, then a state-law cause of action no longer exists. Any cause of action must be a federal cause of action, even if it calls itself something else.

"[C]ongressional intent to displace a state law cause of action – such that there is 'no such thing as a state-law claim' for violation of the right asserted only a federal one – is sufficient to create jurisdiction." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers*, 966

F.3d 661, 669 (7th Cir. 2020) (citation omitted) (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003)).  "'Complete preemption' is not a defense; instead it represents a conclusion that all claims on the topic arise under federal law, so that 28 U.S.C. § 1441 permits removal." *Pollitt v. Health Care Serv. Corp.*, 558 F.3d 615, 616 (7th Cir. 2009) (per curiam).

Complete preemption applies when Congress "so completely pre-empt[s] a particular area that any civil complaint raising [the] select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64 (1987).  "[C]ongressional intent to displace a state law cause of action – such that there is no such thing as a state-law claim for violation of the right asserted, only a federal one – is sufficient to create jurisdiction.  The state law claim is then said to be completely pre-empted and is considered, from its inception, a federal claim." *Sarauer*, 966 F.3d at 669 (cleaned up).  When complete preemption applies, the name tag on the claim does not matter – the DNA of the claim changes from state to federal law.

Complete preemption can give rise to removal.  If the state-law claim is preempted, then it's a federal claim.  And if it's a federal claim, it's removable.  *See Studer*, 867 F.3d at 723 ("[A] defendant can remove a plaintiff's state-law claim if the defendant can show complete preemption because the state law claim, 'even if pleaded in terms of state law, is in reality based on federal law.'") (quoting *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003)); *see also* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722.1 (4th ed. 2023) ("When a plaintiff has asserted a cause of action under state law that has been judicially declared to be completely preempted by federal law, that claim – no matter how it may have been set out in the complaint or characterized by the plaintiff – is necessarily federal, and will be recharacterized as federal, thereby permitting removal.").

"Complete preemption is rare." *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 408 (3d Cir. 2021). It applies only "in a small number of areas." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013). In fact, "[t]he Supreme Court has recognized only three federal statutes that completely preempt analogous state-law actions: § 301 of the Labor Management Relations Act, § 502(a) of the Employee Retirement Income Security Act, and §§ 85–86 of the National Bank Act." *In re Repository Techs., Inc.*, 601 F.3d 710, 723 (7th Cir. 2010); *see also Maglioli*, 16 F.4th at 408 (noting that "[t]he Supreme Court has recognized only three completely preemptive statutes: the Employee Retirement Income Security Act ('ERISA'), the Labor Management Relations Act ('LMRA'), and the National Bank Act"); *Sarauer*, 966 F.3d at 669 ("Only a small number of federal statutes have completely preemptive effect."). The Seventh Circuit has also recognized complete preemption "under a portion of the Federal Communications Act." *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 894.

The list is not rapidly expanding. In fact, "any further expansion of the doctrine . . . requires a clear showing of Congressional intent to eliminate state law entirely." *Id.* The Seventh Circuit has "recognized the narrowness of the doctrine, applying complete preemption only where Congress clearly intended completely to replace state law with federal law and create a federal forum." *In re Repository Techs., Inc.*, 601 F.3d at 723.

To occupy the field and displace state claims, the federal statute must provide a federal cause of action. All the statutes that the Supreme Court has found to completely preempt state law "contain[] an exclusive federal cause of action." *Maglioli*, 16 F.4th at 408. "After *Franchise Tax Board* and *Taylor*, it appears that a state court suit is removable to federal court based on a claim of preemption *if Congress created a cause of action in the allegedly preemptive statute*." *See* Erwin Chemerinsky, Federal Jurisdiction § 5.2.3 (7th ed. 2016) (emphasis added)

46

(citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1 (1983); and *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987)). It is *this* for *that* – a federal claim for a state-law claim.

The Seventh Circuit agrees. "As this circuit interprets the law, the 'ability to bring suit under [federal law] is an element of complete preemption.' Logically, complete preemption would not be appropriate if a federal remedy did not exist in the alternative." *Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) (alteration in original) (citation omitted) (quoting *Vorhees v. Naper Aero Club, Inc.*, 272 F.3d 398, 404 (7th Cir. 2001)). "Otherwise, a plaintiff would be forced into federal court with no relief available for vindicating the same interest." *Id.* (quotation marks omitted).

"[U]nless the federal law has created a federal remedy – no matter how limited – the federal law, of necessity, will only arise as a defense to a state law action and will thus not give rise to the federal question jurisdiction underlying complete preemption." *Id.* (quotation marks omitted); *see also Lancaster v. Astellas Pharma, Inc.*, 2008 WL 4378441, at *3 (S.D. Ill. 2008) ("Under Seventh Circuit law, complete preemption occurs only when a federal statute provides an exclusive federal remedy.").

"A prerequisite to complete preemption is identifying a federal cause of action that includes the same ingredients as the state claim and provides some recovery." *In re Repository Techs.*, 601 F.3d at 723 (quotation marks omitted). The "lack of an express federal remedy indicates that . . . state-law claims are not completely preempted." *Id.*

The question is not simply whether preemption might come into play. The question is whether there is complete preemption, meaning that federal law so preoccupies the field that a state-law claim is out of the picture, and a federal claim is all that is left. A federal statute might have "significant preemptive force" without completely preempting state law. *Id.* But "[a]bsent

47

complete preemption, a defense that relies on 'the pre-emptive effect of a federal statute' does not provide a basis for removal." *Id.* (quoting *Beneficial Nat'l Bank*, 539 U.S. at 11).

As Smith & Wesson seems to concede, the NFA does *not* create a private right of action with the same elements as state tort law. *See* 26 U.S.C. §§ 5801 *et seq.*; Defs.' Resp., at 14–15 (Dckt. No. 48). "[O]n its face, the NFA is a taxing scheme." *United States v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018). In fact, the NFA is part of the Internal Revenue Code (Title 26). "The statute collects occupational and excise taxes from businesses and transactions involving listed firearms – which include short-barreled rifles, silencers, and destructive devices." *Id.*

"But the NFA does more than lay taxes. To carry out the taxing scheme, it also mandates the registration of every importer, manufacturer, and dealer, and of every firearm made or transferred. And to ensure compliance, the statute has teeth: the failure to abide by any of its rules is a crime punishable by up to ten years in prison (or a fine, or both)." *Id.* (citations omitted).

What the NFA does *not* do, however, is provide a private right of action. Instead, it creates a taxation scheme, coupled with firearm-registration requirements and criminal penalties to carry out that taxing scheme. So, on the NFA's face, Congress has not "created a cause of action in the allegedly preemptive statute" itself. *See* Chemerinsky, *supra*, § 5.2.3.

Instead, Smith & Wesson contends that the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, provides a statutory right of review. *See* Defs.' Resp., at 14 (Dckt. No. 48). So, in Smith & Wesson's view, the NFA does have a private right of action, albeit through the Administrative Procedure Act.

The Court disagrees. The Administrative Procedure Act permits suits against *federal agencies* for "legal wrong[s] because of agency action." *See* 5 U.S.C. § 702; *see also id.* § 704

(defining "Actions reviewable" as "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review"). The statute permits courts to "hold unlawful and set aside agency action, findings, and conclusions" that do not satisfy certain standards. *Id.* § 706(2).

The "APA's omnibus judicial-review provision . . . permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). That is, the APA permits suits to challenge federal agency action across a wide array of substantive law.

But the APA does not create a private right of action to sue *private parties* – like Smith & Wesson. So, maybe Plaintiffs could sue under the Administrative Procedure Act to challenge an action by the ATF. But they cannot use the APA to sue Smith & Wesson for allegedly tortious marketing practices, negligence, and infliction of emotional distress. The APA is a way to keep public agencies – not private parties – in check.

In fact, if the APA, coupled with another federal statute, completely preempted an entire field of state law, complete preemption would not be "rare" and applicable only "in a small number of areas." *See Maglioli*, 16 F.4th at 408; *Crosby*, 725 F.3d at 800. Suits challenging agency action under the APA are ubiquitous. But the APA does not completely preempt all substantive areas of law that are subject to agency review under the statute. The APA does not "override[] all possible applicable state law" across the substantive areas that are subject to judicial review. *Crosby*, 725 F.3d at 800.

By pointing to the NFA, combined with the Administrative Procedure Act, Smith & Wesson has not "identif[ied] a federal cause of action that includes the same ingredients as the

49

state claim and provides some recovery." *In re Repository Techs.*, 601 F.3d at 723. The APA does not permit plaintiffs to sue the same defendants. An APA claim does not have the same elements as the state-law tort claims, either.

Again, "[t]he elements of a claim under the ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; . . . (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce"; (4) damages; and (5) proximate cause. *Leszanczuk*, 21 F.4th at 940 (quotation marks omitted). These are not the elements of a claim under the APA. Under the APA, "a court must set aside an agency determination if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or if it is 'unsupported by substantial evidence.'" *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1024 (7th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A), (E)). The APA permits a court to "deferentially examine an agency's work, but not rubber-stamp it." *Id.*

In short, judicial review of agency action does not preempt the ICFA. It does not preempt Plaintiffs' other state-law tort claims, either.

Moreover, the NFA does not include a "clear showing of Congressional intent to eliminate state law entirely." *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 894. In fact, it shows the opposite congressional intent. The NFA's chapter on criminal penalties includes a provision clarifying the statute's effect on state law. "*No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter*, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together." *See* 18 U.S.C. § 927 (emphasis added).

Included within this chapter of the U.S. Code are the NFA's licensing requirements – the same licensing requirements that Smith & Wesson argues completely preempt state law. *See* 18 U.S.C. § 923; Defs.' Resp., at 4, 14–15 (Dckt. No. 48). But Congress was clear that the NFA's licensing requirements do not completely preempt state law, even if they preempt conflicting state laws. *See City of Gary ex rel. King v. Smith & Wesson Corp.*, 94 F. Supp. 2d 947, 952 (N.D. Ind. 2000) (noting that "§ 927 of the Gun Control Act specifically allows non-conflicting state regulation").

In sum, Smith & Wesson may not remove this case based on the complete preemption doctrine because the NFA does not create a private right of action. The NFA also does not include a clear congressional intent to completely preempt state law.

## IV.     Artful Pleading Doctrine

The last proffered basis for removal is the artful pleading doctrine.

Smith & Wesson contends that "Plaintiffs' state law claims are an artfully pleaded attempt to have a state court improperly overturn the ATF's determination that semi-automatic rifles, like the M&P rifle, are not 'machine guns' subject to the regulatory requirements of the NFA." *See* Notice of Removal, at ¶ 16.b (Dckt. No. 1). In Smith & Wesson's view, because Plaintiffs' "state-law claims are foreclosed, implausible, and insubstantial under Illinois law," the claims must be federal claims in disguise. *See* Defs.' Resp., at 8 (Dckt. No. 48).

The Court can make short order of this argument. The artful pleading doctrine does not permit Smith & Wesson to remove this case.

"Artful pleading on the part of a plaintiff to disguise federal claims by cleverly dressing them in the clothing of state-law theories will not succeed in keeping the case in state court." *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Board Health & Welfare Tr. Fund*, 538

F.3d 594, 596 (7th Cir. 2008).  But as discussed above, this case does not present federal claims or necessarily raise a federal issue.  So, Plaintiffs' claims are not federal claims in disguise.

## V.    Consent

The Court ends by closing the loop on one final point.  Plaintiffs contend that Smith & Wesson may not remove this case for another reason.  They argue that Smith & Wesson did not get the consent of all Defendants to remove.  *See* Pls.' Mtn. to Remand, at 7 (Dckt. No. 26).

Removal generally requires the consent of all defendants.  "When a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action."  *See* 28 U.S.C. § 1446(b)(2)(A).

That provision governs removal "solely under section 1441(a)," and thus does not cover removal under the federal officer removal statute, meaning section 1442.  *Id.*  So, if the federal officer removal statute applied, Smith & Wesson would not need the consent of the Crimos.

But section 1441 does govern removal based on federal question jurisdiction under 28 U.S.C. § 1331.  *See* 28 U.S.C. § 1441(a).  So, as a starting point, Smith & Wesson would need the consent of all defendants to remove the case based on federal question jurisdiction.

Smith & Wesson acknowledges that it does not have the consent of all Defendants to remove this case.  Defendants Crimo Jr. and Crimo III have not consented to removal.  *See* Notice of Removal, at ¶ 9 (Dckt. No. 1).

Instead, Smith & Wesson argues that it did not need the consent of every defendant.  The removal statute includes a provision that applies when a complaint includes a mixed bag of claims, meaning claims over which the court has jurisdiction (because they arise under federal law) and does not have jurisdiction (because they do not fall within the court's original or supplemental jurisdiction).  As an example, imagine a complaint that includes a federal claim

and a state-law claim against two defendants, when there is no diversity and no supplemental jurisdiction over the state-law claim.

Under the removal statute, if a case includes *both* "a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title)," *and* "a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute," then "the entire action may be removed if the action would be removable without the inclusion" of the state-law claim. *See* 28 U.S.C. § 1441(c)(1). In that situation, "the district court shall sever from the action" the claims that are "not within the original or supplemental jurisdiction of the district court or [claims] that [have] been made nonremovable by statute" and remand them while retaining jurisdiction over the federal claims. *Id.* § 1441(c)(1)–(2).

That is, section 1441(c) contemplates that a complaint might include both federal claims and state-law claims. If the court does not have original or supplemental jurisdiction over the state-law claims, a defendant can remove the case, and the district court can sever the claims where there is no jurisdiction. "In plain terms, Section 1441(c)(2) requires the Court to remand 'separate and independent' claims that are removed with a federal question claim but that fall outside the Court's jurisdiction." *Elftmann v. Village of Tinley Park*, 191 F. Supp. 3d 874, 882 (N.D. Ill. 2016) (quoting *Montano v. City of Chicago*, 375 F.3d 593, 600 (7th Cir. 2004)).

In that situation, there is no need for all defendants to consent to removal. Under section 1441(c)(2), a defendant does not need to consent if that defendant is facing claims over which the court lacks jurisdiction. When a defendant is facing a state-law claim (only), and when a federal court lacks jurisdiction over that claim, there is no need to get the consent of that defendant because that defendant will get shipped back to state court anyway. *See* 28 U.S.C.

53

§ 1441(c)(2) ("Only defendants against whom a claim described in paragraph (1)(A) has been asserted are required to join in or consent to the removal under paragraph (1).").

So, in Smith & Wesson's view, it does not need the consent of Crimo Jr. and Crimo III. The Court does not have original jurisdiction over the state-law claims against the Crimos (because of the lack of diversity). And as Smith & Wesson sees it, there is no supplemental jurisdiction over those claims because they are not part of the same case or controversy as the rest of the case. *See* 28 U.S.C. § 1367(a) (creating supplemental jurisdiction when the claim "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014) ("Claims form part of the same case or controversy when they 'derive from a common nucleus of operative fact.'") (citation omitted).

The argument fails because it assumes the existence of a federal claim, which is a necessary element under section 1441(c)(1)(A). The statute applies only when the complaint includes a claim that arises under federal law. *See* 28 U.S.C. § 1441(c)(1)(A). But here, as explained above, no claim arises under federal law. If one of the other claims *did* arise under federal law, then Smith & Wesson potentially could remove the case without the consent of the Crimos. But that's not this case.

## Conclusion

For the foregoing reasons, Plaintiffs' motions to remand are hereby granted in each of the consolidated cases. All of the consolidated cases are remanded to the Nineteenth Judicial Circuit Court of Lake County, Illinois.

Date:  September 25, 2023

_____

Steven C. Seeger
United States District Judge